MYERS v. LEAGUE et al.

(Circuit Court of Appeals, Fifth Circuit. May 1, 1894.)

No. 193.

VENDOR AND PURCHASER—TIME OF ESSENCE OF CONTRACT.
    A contract for the sale of several tracts of land for a certain price, part in cash and the remainder in notes, the vendors to furnish abstracts of title, provided that the title was to be good or to be made good, or the contract to be determined; sale to be closed, and notes executed, within 45 days from delivery of complete abstracts. The market value of the lands was increasing rapidly, and all the parties were dealing in them as a commercial speculation. Their subsequent correspondence and conduct showed that the vendors regarded the time limited as an essential element, and that this was recognized by the purchaser. After expiration of that time, the purchaser repeatedly applied for an extension, but failed to accept the terms offered by the vendors; and thereafter negotiations proceeded on the understanding on the vendors' part, tacitly assented to by the purchaser, that the contract was at an end. *Held*, that it must be implied that time was of the essence of the contract, and that the parties were estopped from denying that they agreed that the contract was ended.

Appeal from the Circuit Court of the United States for the Eastern District of Texas.

This was a suit by Henry H. Myers against J. C. League and J. R. Coryell, for specific performance of a contract for the sale of land by defendants to complainant. At the hearing the circuit court dismissed the bill, but decreed that defendant League should repay to complainant a certain sum of money paid by complainant as part of the contract price. Complainant appealed.

R. R. Briggs, for appellant.

Farrar, Jonas & Kruttschnitt and A. R. Campbell, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and PARLANGE, District Judge.

McCORMICK, Circuit Judge. In 1890 the appellant was a resident citizen of the state of Minnesota. He and his brothers were associated in business in the city of Duluth, under the firm name of Myers Bros. Their attention was drawn to Galveston, Tex., by the projected government work on that harbor. The appellant and one of his brothers visited Galveston in October, and, after studying the situation there, concluded to try and acquire a body of land, made up of different adjoining surveys, and owned by different parties, situated on the main land fronting on Galveston bay and on inlets from it. The appellees' attention had been directed to the same object. League and Coryell had acquired four surveys in the desired locality. Three of these, described as the Grant, Ferguson, and Smith surveys, embraced together 4,214 acres, more or less, and the other, described as the Johnson survey, contained 1,476 acres, all being parts of a body of 8,542 acres, which appellant wished to acquire. All the parties were dealing in these lands as a commercial commodity, having an eye to how the same would be affected by the harbor improvement

and the anticipated course of speculative enterprise probably incident thereto. Situation with reference to water front, more than quality of soil, controlled. League and Coryell wanted to sell the three first-named tracts as a whole. They placed all the tracts in the hands of Trueheart & Co. to sell for them. All were contracted to be sold the appellant by Trueheart & Co.,—the Johnson survey by a separate contract, on different terms as to time of closing; the other three by a written memorandum in these terms:

"Received Galveston, October 27, 1890, of Henry H. Myers, twenty-five hundred dollars, account of this contract to close sale to him of the following named tracts of land, to wit: 1,476 acres originally granted to James Smith; 1,476 acres originally granted to John Grant; and 1,262 acres originally granted to Hamlet Ferguson, Jr.,—all situated in Galveston county, state of Texas, and sold by acreage called for in the respective patents, be they more or less, and for the total price of $50,556. Terms of sale: One-third cash (including the amount hereby receipted for), say $16,852, and the remaining two-thirds, say $33,704, payable by 18 notes, in one, two, and three years, as follows: One note, $1,234.66, at one year, and on payment of which buyer may select for release 102 acres; five notes, $2,000 each, at one year, and on payment of which buyer may select for release 830 acres, or 166 acres for each note; one note, $1,234.67, at two years, and on payment of which buyer may select for release 102 acres; five notes, $2,000 each, at two years, and on payment of which buyer may select 830 acres, or 166 acres for each note; one note, $1,234.67, at three years, and on payment of which buyer may select for release 102 acres; five notes, $2,000 each, at three years, and on payment of which buyer may select for release 830 acres, or 166 acres for each note,— all said notes bearing interest at the rate of 8 per cent. per annum from this date, and interest payable annually at Galveston, Texas, to the order of J. C. League, and secured by vendor's lien and deed of trust, at expense of buyer. Deed at expense of sellers, as well as abstracts of title to each tract. Sellers to pay all taxes to and including 1889, if any, and pro rata of taxes for 1890 to this day; and buyer to pay balance of pro rata taxes for 1890. Title to be good, or made good, or this payment to be refunded, and this contract determined. Sale to be closed, and notes, etc., executed, in accordance herewith, within forty-five (45) days from delivery of complete abstracts; and, upon payment of last notes, all the remaining land to be released from vendor's lien and deed of trust. Releases at expense of buyer.

"H. M. Trueheart & Co., Agents for League & Coryell.

"J. R. Coryell, for Self and as Agent for J. C. League.

"I hereby accept the foregoing contract of sale, and promise and agree to execute notes and deed of trust, and do all things therein named on me incumbent, in accordance with the terms and conditions thereof.

"Henry H. Myers.

"I hereby ratify and confirm the foregoing copy of contract of this sale, the same having been executed in duplicate, and this ratification being signed by me for delivery to the buyers. J. C. League."

R. G. Street, an attorney at law in Galveston, was retained as such for Myers Bros. with respect to this matter, and was also empowered to represent them as attorney in fact therein. H. H. Myers and his brother, J. R. Myers, returned to Duluth. Abstracts were delivered to Mr. Street, for which he receipted as follows:

"Galveston, Texas, 2 p. m., Nov. 1st, 1890.

"Rec'd of Messrs. H. M. Trueheart & Co. three abstracts (3) of title by Joseph Franklin, with supplements, respectively, by Island City Abs. Co., brought down to date, viz.: (1) To Hamlet Ferguson, grant of 1,261 acres, in Galveston Co.; (2) to James Smith, ⅓ of a league, Galveston Co.; (3) to Jno. Grant, ⅓ of a league, Galveston Co.

"Robt. G. Street, Atty. for Myers Bros."

Three days later, Mr. Street wrote as follows:

"Galveston, Texas, November 3, 1890.

"Messrs. H. M. Trueheart & Co., City—Gentlemen: Please furnish me with all the original title papers to the Grant, Smith & Ferguson surveys. I call your attention particularly to certain evidences of title you are supposd to have, but which are not recorded in this Co.; in the Grant survey, the patent and copy of decree of partition in the estate of N. A. Ware; in the Ferguson survey, copy of order of sale, decree of confirmation, etc., in the estate of Hamlet Ferguson; also certified copy of will and probate, John C. Cutter; in the Smith survey, patent and affidavit showing Mrs. Fulton's heirship.

"Very truly yours,                              Robt. G. Street,
                                                   "For Myers Bros."

The receipt Mr. Street had given for the abstracts having got mislaid, League and Coryell, being desirous to have the date fixed, applied to Mr. Street, who could not furnish it, but agreed that it was not later than 12th November. The papers Mr. Street had called for were promptly furnished; and, before the expiration of 45 days from the 12th November, Mr. Street returned to League's office the title papers that had been furnished him, without any further suggestion of defect in the abstracts or title. On 18th December, Trueheart & Co. telegraphed appellant at Duluth: "Shall we send you League papers for examination, or will you come down? Answer." Same day, Myers replied: "Send papers here." The papers were dispatched next day by mail. On the 29th, Trueheart wired appellant: "League asks if you are ready to close up. We sent you papers on 19th." Thirtieth December, Myers telegraphed Trueheart: "Trust deeds must be made to grantor. His wife must join in deed." Same day, Trueheart replied by wire: "League papers made as per sale contract. League desires matter closed." On January 1, 1891, League wrote Myers that limit for execution of contract had been passed since December 27th, and that this letter was to notify Myers that League would hold himself free to take such steps for the protection of his interests in the premises as he might deem necessary, but would not take any steps in this matter until after due time for response to this letter to reach League by wire. On January 6th, Myers wired from Duluth: "Letter received. Are waiting reply from Street to letter written him January first. Please wait for letter. Will write you to-day." Same day, Myers wrote: "We ask your kind indulgence for a few days more." Same day, League replied to telegram, by night message: "Your time is up for closing purchase. Trade demands consummation at once. Wire immediate answer." Myers wired on the 8th: "Will you grant thirty days' extension for closing deal?" On the next day, League sent night message: "Will grant thirty days' extension of contract by additional payment on it to me of not less than five thousand dollars by fifteenth instant. Wire immediate acceptance." There was no wire of acceptance. On the 12th, Myers wired: "Do you grant request in our letter to Street, January first, in extension?" On that day League wrote: "I have your mail favor of the first instant; also your dispatch of same date, and two others of subsequent dates. * * * I think it will be kind, frank, and busi-

nesslike to say to you that this communication ends all this on my part. * * * If the posture of your affairs is such as requires an extension until the first of February next, and your application, accompanied by cash, not less than three thousand dollars, as a further deposit of earnest money, and to apply as part of the cash payment, reaches me before I have taken such steps as to put it out of my power to grant the extension, I will do so; but I desire you to understand you have breached the contract." On January 19th, J. R. Myers wired League: "If I go to Galveston, and close deals February 1st, will it be satisfactory? Answer." On January 22d, J. R. Myers wired Trueheart: "Ascertain from League why he does not reply to our telegram January nineteenth about closing February first. Wire answer,"—to which Trueheart replied by wire: "League says has written you fully, and has nothing more to say." Receiving nothing further from Mr. League or from Mr. Trueheart, J. R. Myers went to Galveston. He arrived there February 2d. Previous to this, League had instructed Trueheart to leave everything connected with this matter to League, and, when Myers called at Trueheart's office on the 2d of February, Trueheart telephoned for League, but was unable to get him. Myers called the next morning (3d February), and Trueheart went over with him to see League and Coryell. There is a sharp conflict in the testimony as to what occurred in the interviews between J. R. Myers and League and Coryell, but the conclusive preponderance of the evidence is to the effect that when, in this first interview, Mr. Myers told them, "I have come here for the purpose of closing for those lands we bought in October," he was answered, "We have no time to talk with you to-day." After some insistence on both sides, Myers said, "When can I see you?" and was answered, "We cannot talk with you until day after to-morrow." Mr. Myers waited, and about 10 a. m. on the 5th went again to their office. When the business was broached, Mr. League said promptly and firmly: "We won't talk to you about those lands upon any contract made with you. You breached that contract. It is at an end. If we talk to you about those lands, it must be on another and distinct proposition." Myers said he would like to get the lands. League said: "We have not parted with the lands. We can sell them to you if you wish to buy, but we won't talk to you about it except on the understanding that the October contract is at an end." Myers said he would like to know how he could get the lands, and was told: "We will sell you the lands (including the Johnson tract, about which there was a separate contract) at $12 per acre. No question about title or examination, but close to-day, on the same terms as to payment specified in October contract." The result of this interview was summarized in a written proposition as follows: "Mem.: (1) Mr. Myers to close the purchase of the four tracts of land. (2) To pay interest on the amount cash due upon 27th December last. (3) To agree to our reserving in our conveyance of the Thomas W. Johnson 60 acres out of the southwest corner of that survey, on account of squatters on it, the

60 acres to be deducted at $12 per acre; and, if Mr. Myers desires, League's sufficient obligation in writing to convey this 60 acres to said Myers when he shall have recovered it, or such part as he may recover. Suit now pending, with agreement to try this term." Myers did not know about the title to the Johnson tract; said he would see Mr. Street about that, and let them know; that he would come back directly. He went out to go to Street's office, and did not return. The next day, League received a message from Myers, sent from Denison: "Message last night called me home. Street will close with you on all that has good record title. Will return about 1st March." The same day, Street advised League by letter that he was prepared to close for Grant and Ferguson tracts; could not recommend Johnson title; and record title to the Smith tract was unsatisfactory. Thereupon League demanded and received from Street the abstracts of title to the lands that had been furnished Street. February 20th League wrote Street that the only matter for consideration between Myers and him was the matter of the earnest money, as to which he would take legal advice that day, and be ready from that day to pay over the whole or such part as he should of right or legally pay. Street replied February 23d, renewing offer to complete purchase of Grant and Ferguson surveys, saying he was prepared to make cash payment, admitted no forfeiture, waived no right on the part of Mr. Myers, but, with a view to prevent litigation, would be pleased to transmit to Mr. Myers with favorable indorsement any proposition he could recommend. On the 27th, League notified Street that he would pay over to Mr. Myers, or to Street, as his attorney, the whole of the earnest money deposited whenever either called for it. League had on the 11th of February contracted to sell these lands to Kohfeldt, but the contract was not fully executed and deeds filed for record till March 16th. March 3d, Street gave League written notice of Myers' claim for specific performance of his contract for the sale of the Grant, Smith, and Ferguson surveys, saying in the notice: "And herewith tenders, as he has heretofore done, full performance on his part with the stipulations thereof." On March 13th, H. H. Myers, in person, made full tender of the cash payment and notes and deed of trust prepared, executed, and acknowledged as stipulated for in the October contract. The tender was acknowledged and refused. On March 23, 1891, the bill in this case was filed. It is unnecessary to recite its charges or the pleas and answers. At the hearing, the circuit court dismissed the bill, with costs, and decreed that J. C. League should pay the appellant, H. H. Myers, $2,500 within 30 days from the date of the decree, with 6 per cent. per annum interest thereon from said date until paid; "and, in default thereof, then that the said Henry H. Myers do have his execution for," etc., and for "the costs incident to the issuance of said execution."

It is familiar doctrine that courts of equity will decree specific performance of a contract at the suit of one who has made default, on substantial compliance on his part, where time is not of the

essence of the contract; that time may be made of the essence of the contract by express stipulation of the parties, or such a stipulation may be implied from the nature of the subject, from the conditions of the parties, or from their avowed or known purpose in making it. The result of all the earlier decisions is summarized in Taylor v. Longworth. 14 Pet. 172, and the rule as definitely stated as the nature of the subject will permit. Scarborough v. Arrant, 25 Tex. 129. With these all subsequent cases agree. The reports abound with illustrations of the application of this rule, in the practice of courts of equity, to the various cases in which such relief has been sought. Was time of the essence of the contract which is the basis of the appellant's suit? A time within which the executory contract is to be executed is definitely stated, but it is not literally written that time is to be considered of the essence of this contract. The subject of the contract is land,—that species of property which, by its fixed situation and qualities, has engrossed the term "real" as its peculiar descriptive. By reason, however, of its fixed situs, its market value is subject to severe fluctuations. Of this we have had recent and widely-felt experience. We have also a clear indication of it in the case we are considering. The lands here involved were bought by League in November, 1889, at from $1.75 to $2 an acre. He contracted in October, 1890, to sell them to the appellant at $12 an acre. The appellant avers that before the 13th of March, 1891, he had sold, or had agreed to sell, these lands at more than $35 an acre. It was not pertinent to inquire their market value at the time of the hearing of the case in the circuit court, March 14, 1893, or at the hearing of this appeal, April 9, 1894. We are only interested to observe that, however fixed and real as to their material qualities may have been these salt marsh lands, no point of which rose more than a few feet above the level of the sea at ordinary tide, they were subject to such a tide in their market value as to exact that dealers in them, at the time of this rapidly swelling flood, should take and observe sharp notation of its stages, and hold their ventures well in hand to act on the indications of its continuing flood or of its ebb. These parties stipulated that their contract should be closed within 45 days from the delivery of complete abstracts. The appellees League and Coryell delivered what they considered were complete abstracts. on the third day after the actual signing of the contract to sell. The attorney at law and in fact of Myers Bros., by a properly written memorandum, acknowledged the delivery of abstracts by Joseph Franklin, with supplements by Island City Abstract Company, brought down to date, on the 1st day of November, 1890. The 45 days was not a limit merely of the time in which money payment should be made. For default in making payment of money, reparation could be made by the addition of customary interest. The relation of this limitation of time is to the contract to purchase and sell. That is what is to be closed. And the time begins to run, not from the day when the title is shown to be good, or is made good, but when complete abstracts are delivered. The title is to

be good, or to be made good. It is not material for us to inquire whether the purchaser could have insisted that this also should be shown or done within the 45 days from the delivery of the abstracts. If so, and the title was not shown to be good, or made good, he could, and he only could, have required that his payment be refunded, and the contract determined. The sellers were bound to deliver complete abstracts within a reasonable time. The buyer was bound to examine these within a reasonable time, and to notify the sellers of any real or apparent defects which he or his legal adviser found in the title as shown by the abstract. All such real or apparent defects as the sellers could supply were to be supplied. That the purchaser might have proper time to reach a sound conclusion as to the title, and the seller have reasonable time to supply such evidence of title as the abstracts from the county records complete to the date did not show, seems to have been the purpose of this limitation of 45 days. The days, therefore, began to run from the delivery of complete abstracts. It is perhaps common knowledge, but, if it is not, the proof in this case sufficiently shows, that a seller who contracts to deliver complete abstracts of title does not contract to make such abstracts himself. The parties alike understand that certain persons or companies, in the particular locality, are engaged in the business of furnishing abstracts of title to lands, as shown by the public records for such title in that locality. These abstracts are not muniments of title. They are only notes (indexes, with remarks) of the respective links in the chain of title that have been recorded as authorized or required by law.

Is it not apparent from the conduct of all the parties that they regarded the time limited as an essential element in this contract? Certainly, even the appellant must have recognized that the appellees League and Coryell so regarded it; and, if the appellant did not so regard it, why did he write Street, January 1st, to obtain extension? Why did he, on January 6th, wire from Duluth: "Letter received. Am waiting reply from Street to letter written him January first. Please wait for letter. Will write you to-day"? Why, on the same day, January 6th, did he write to League explaining delay, and saying: "We ask your kind indulgence for a few days more"? Why, two days later, wire League: "Will you grant thirty days' extension for closing deal"? A careful consideration of the proof leaves no reasonable doubt in our minds that all the parties to this contract considered that time was of its essence. In addition to this, it is certain that before February 5, 1891, Myers Bros. knew that League considered the contract determined by their breach of it. The contract was signed by the appellant, but it was made by and for Myers Bros. The conclusive preponderance of the proof shows that on February 5, 1891, all the parties agreed that the contract had determined. Giving to the testimony of J. R. Myers the most force that the appellant can claim for it, there can be no doubt, when we consider League's previous letters and telegram, and his refusal to communicate further by wire or letter, and his refusal to talk about the matter when approached on it

February 3d, that League did on February 5th, as he and Coryell and Hatch and Campbell all testify, say and repeat with persistence to Mr. Myers, until it was tacitly, at least, assented to by Mr. Myers, that he would not talk to Mr. Myers about the purchase and sale of these lands except on the understanding that the contract was at an end. It is not necessary to recapitulate the proof sufficiently shown in the statement of the case. In our opinion, the nature of the subject of this contract, the condition of the parties when it was made, the well-known purpose of each in making it, and all the subsequent conduct of each in reference to it, raised the necessary implication that time was an essential element in it; and we consider it is conclusively shown by the proof that all the parties are estopped from contending that either one did not agree that the contract was at an end on February 5, 1891. It follows that the appellant is not entitled to the relief he seeks by his bill. It, however, appears that J. C. League has $2,500 of the appellant's money, which should have been refunded to him at the determination of the contract. The right of the appellant to receive this money was acknowledged by League on the 27th of February, 1891. League has not made such a tender of this money as the appellant should be required to have accepted.

We conclude, therefore, that the circuit court should have decreed that League pay this money to appellant, with 6 per cent. per annum interest thereon from the 12th day of January, 1891, until paid, with all the costs of the suit, within 30 days from the date of the decree, otherwise execution therefor to issue against him, and that in all other respects the bill be dismissed. For the purpose of having the decree corrected as indicated, the decree is reversed, at the cost of the appellee J. C. League, and the case is remanded, with direction to the circuit court to enter the decree in accordance with our order.

Ordered, that the decree appealed from is reversed, and the case is remanded to the circuit court, with direction to enter a decree in favor of complainant against J. C. League for $2,500, with 6 per cent. per annum interest thereon from February 12, 1891, until paid, and all the costs of suit, with execution if payment is not so made in 30 days, and in all other respects dismissing the bill.